Thank you very much. Thank you. All right, our second case for this morning is Andersen v. Village of Glenview, No. 19-2738. And we will hear first from Ms. Andersen. Good morning. Thank you for the opportunity. This, as you saw in the briefs, was characterized as a quote-unquote contentious matter. And actually, back when I was a partner in a large law firm, I actually thought this was going to be a completely amicable divorce as far as they go. I had a way of child support and alimony to get to that point. I had no interest in going toe-to-toe in divorce courtroom for years. I wanted peace for my family. Unfortunately, now here we are before the court, and I have been harassed, and I consider this a complete abusive process with what's happened to me in my life. This scheme basically stems from divorce attorneys using criminal matters in violation of the rules of professional conduct, and they use it to gain advantage in custody cases. And that happened to me twice. It happened years prior to the incident that's before your honors. It happened a couple years around 2013-2014. So when I saw what was coming in 2015, I knew what my ex-husband was up to. He is an emergency room doctor, and he has been abusing his medical license for years to basically make disparaging mental health comments to me in the community as part of the custody case and, as you see, in the criminal case. So, Ms. Anderson, let me just suggest that it would probably be a good idea for you to focus on what the district court did here and its reasons for doing it because that's clearly what we're here to decide. Certainly, of course. In terms of the motion to dismiss, first of all, there's nothing wrong with the sufficiency of this complaint. This complaint was pled for state court. There's been no serious challenge as to what is actually wrong with this complaint. 9B, there's really no serious question that 9B was not applicable to this pleading. I believe that was clear error, and there's really been no argument to the contrary. Really, what this comes down to was that counsel for defense put evidence in front of your honor that was highly inappropriate for the motion to dismiss stage, basically hoping that you would not see the forest but for the trees. So why doesn't that evidence fall within the rather well-established doctrine that materials referred to in the complaint can be looked at at the 12B6 stage without expanding the process all the way over to a Rule 56 summary judgment motion? There was nothing concededly authentic about these tapes in any regard. Does that matter? If that's what the police officer saw, why does the authenticity matter? Well, first of all, it certainly matters for my ex-husband in terms of that, and it certainly matters for the police officer because it goes to the reasonableness of what he was looking at. This police officer let my ex-husband collect the audio tapes, tamper with them. The evidence is very clear from my forensic expert that he tampered with them as he deleted exculpatory text messages. So it was very clear this evidence was tainted well before this case was ever filed. It was discussed in the criminal case. It never should have been considered for purposes of this motion. Counsel, one concern that I have is that there was not a dispute that you sent the text messages to your ex-husband and to various family members and that when your ex-husband reported that to the police officer, that was a basis for giving him probable cause on the telephone harassment charges. And you didn't deny sending the texts. Well, actually, the texts came to me. Actually, the texts that the police officer did not collect were actually harassing towards me. So this was like cherry-picking of evidence. Basically, this police officer comes in. He takes me responding to harassing texts. He disregards everything that I told him. I told him that there were motions for protective order. There were three police reports to tell him to go away. There were correspondence with counsel to go away. This man was the stalker. This man was the harassing party. And the probable cause is a factual dispute. This police officer basically turned a blind eye to everything that I told him to look at, which was exactly what happened years prior. And, in fact, it was so bad years prior, I went to the chief of police to complain about cronyism. My ex-husband could have gone, if there were truly harassment, he could have gone to divorce court. He didn't do that. Why? Because he knows the police officers. I think that my cronyism allegation has been overlooked. He has known these police officers. That's why he goes to them. He didn't go to domestic relations court. He went to the police. And, in fact, he went to the police in August. They laid in the weeds, and they set me up for the September calls. I asked them for help. Three police reports. They did nothing. All of that goes to probable cause. They ignored my complaints of harassment, didn't tell them to do anything, and instead did the opposite. They set me up. And that was discussed in the criminal case, and that's basically why these charges were thrown out. Ms. Anderson, it's Judge Scudero. Let me ask you just a factual question, okay? Yes. Did your federal complaint allege the interactions that I think you're referring to with Detective Popkov? Did you allege that they occurred before the September arrest? Yes, I believe I do, Your Honor. There were three calls. There were three police reports that were filed before the incident in question. Okay. By me. Okay. And you know where in your federal complaint you allege that? I would have to pull it on my screen, Your Honor. Unfortunately, it doesn't have it in front of me. All right. But, Your Honor, I do believe it was very clearly laid out that I was in domestic relations court, seeking protective order to get him to leave me alone, and that there were three police reports. And instead they characterized my reports as civil in nature and sent me away. And at the same time, in August, they didn't tell me that they were going to record me and try to get a gotcha moment. And the irony of the August calls was me telling my ex-husband, who hid my kid's phone, you know, give the kid's phone back, you know I don't want to talk to you, was the gist of the August calls. So the irony is I was being accused of stalking and harassment when I couldn't get this man to stop communicating with me and to harass me. The text messages that he deleted were to my children, and he deleted them after a preservation order was issued. My ex-husband did everything to tamper with the evidence. And it's very clear from my forensic expert in his opinion testimony. So the bottom line is, this was certainly, probable cause was not something that should have been heard at a motion to dismiss stage. There were questions as to the reasonableness of the police officer. I tried to show him this evidence. I tried to show him that this was crazy. And he disregarded everything I had to say. So what authority do you have for the proposition that probable cause is a factual issue that a trier of fact would look at, as opposed to something for the judge to evaluate at any stage appropriate? Well, I think I cite that in brief. I mean, we routinely consider questions whether there was probable cause to move forward on the criminal side of our docket, where somebody will have filed a motion to suppress an arrest or a search or something, and so the court will resolve the question whether there was probable cause. Page 13 of my brief, a motion to dismiss based on probable cause is typically procedurally improper. Mearby versus Marshall Field and Company. Indeed, given the facts relative to probable cause in Section 1983, that they're usually a question of fact. It's usually a matter for the jury. That's Gonzales v. City of Elgin. Chilios, I think is how you pronounce it, v. Heavener. Basically, page 13 gives you about five cases for that proposition. In this case, it was very contested, and here we had a police officer. We had to adjourn the criminal trial. He was so bad. He had no basis, Detective Popoff, in testifying as to chain of custody. His testimony was so bad, we had to adjourn the criminal trial so that we could take a break so I could order the transcript. This police officer also, while the case was pending, filed a fake police report because I believe he was concerned that he knew that his allegations were frivolous. So this police officer has severe credibility issues, and I give you cases also that when the credibility of the parties, here an ex-husband who tampered with evidence, here an ex-husband who had a custody agenda, and the police officer who had credibility issues throughout, and in fact, when he was told to bring in the original audio recordings for forensic testing, he came in and tried to mislead my expert, and he marked them as quote-unquote original. My expert had to come and say, no, these are not original in any regard. So we have credibility issues by these people, and there's substantial evidence to that, and that is something that the jury should be taking a look at, and not in a motion to dismiss stage. Okay, I don't want to manage your time for you, but you had indicated you wanted five minutes of rebuttal, and you're down to about four and a half. Okay. So if you'd like to wait and rebut. I'll wait, I'll wait and hear the comments, and then I can just continue arguing if that's okay. All right, that's all right with me. Thank you. All right, so it looks like we first have Lisa Meador, Meador? Good morning. May it please the court. Lisa Meador on behalf of defendants, the village of Glenview and Detective Popcoff. As you're aware, we have many issues up on appeal today. I'm going to focus on a couple of them in the time that I have this morning with your honors. The first is the district court's consideration of the voicemail recordings and the video of the police interview at the motion to dismiss stage. Just for clarification, these were not text messages. They were voicemail recordings based on calls and messages that the plaintiff left in September of 2015. In fact, at that time, she unleashed a barrage of disturbing and threatening calls and voicemail messages related to her ex-husband, Dr. Gimbel, to Dr. Gimbel himself, his mother, his mother-in-law, his brother, his accountant, his boss at the emergency room, his babysitter, and even his Boy Scout, son's Boy Scout leader. You're very clear, and the record seems very clear, that there is this barrage, as you say, of messages. But what I would like to know is whether there is any evidence or indication even, I don't want to use the formal term evidence, that there was an equal barrage going in the other direction from Dr. Gimbel over to Ms. Anderson. Your Honor, there is the consideration of the detective at the time of the evidence that he receives it. And that constituted probable cause for him based on his investigation, his consideration, his hearing of the messages themselves, and the corroboration from the other individuals who received the messages. So you're saying that the detective did not have in front of him any evidence of, let's say, a two-way street? That's correct, Your Honor. Ms. Matter, let me see if I, just to, in furtherance of the question that I think Judge Wood is getting at. On the timeline, as I understand it, correct me if I'm wrong here, Detective Popkov was assigned to the matter for the first time and had no history before September 8, 2015. Is that correct? That's correct. I will say that at some point years prior, Detective may have seen Dr. Gimbel at the emergency room where he worked due to their professional duties, but they were not acquaintances at the time. Okay, so September 8 was a Tuesday, and the arrest occurred on Thursday, September the 10th. Yes, Your Honor. Part of what I was trying, I was asking, I may not have been complete in the question to Ms. Anderson, and that was, between that very limited period of time, September 8 and September the 10th, is there anything in the complaint or otherwise to suggest that Detective Popkov came into possession of all of these other communications that, I think Ms. Anderson is right to say they definitely had significant complexity, but did Detective Popkov have any of that information in that three day window of time? Your Honor, he did not. He did, after the arrest of Ms. Anderson, obtain information from her in her police interview. However, it is not incumbent upon him, once he had probable cause for that arrest, to continue an investigation. The charges, he had, since he had probable cause for that arrest, that was his obligation at that point. So, Ms. Petter, can I ask you a question about the, oh, sorry, Chief Judge Wood. No, no, go ahead, Judge Barrett. I have a question about her substantive due process claim to loss of family relations during the 30 days when she was deprived of custody of her children. Do you conceive of this as a Fourth Amendment claim or a 14th Amendment substantive due process claim? Because it was a condition of her bond, right? So, I'm wondering whether that is something that ought to be considered part of the Fourth Amendment seizure or a substantive due process claim. What is your view? Our view is that it is part of the Fourth Amendment claim. But regardless, it's, under either analysis, as the district court pointed out, the end result is the same, that there is no evidence. First of all, I would say that in the complaint itself, the plaintiff doesn't make any allegations as to Detective Popkopf Post's indictment to continue it beyond that stage. And then, in addition, there is no evidence that was developed by the plaintiff to establish that there was any involvement or influence by Detective Popkopf in the decision that the bond court made at that time. That the identification was broken at that point. Yes, Judge. Okay. So, our position is, I apologize, going back to the voicemails and the video. They were properly considered by the district court because plaintiff referenced them in her complaint, in fact, admitted to making the calls. And they were central to the claims that she set forth, specifically her false arrest and malicious prosecution claims, as well as her conspiracy and intentional infliction of emotional distress claims. She doesn't argue that they were not utilized as the evidence that was presented to the court for her charging and the criminal complaint. So, it was properly considered at the motion to dismiss stage by the district court. And plaintiff can't avoid that consideration by failing to attach them as one of the some 57 exhibits she attached to her complaint. So, Ms. Menner, at this stage, is the Villages only involvement, the one with respect to the Monell claim? Yes, Your Honor. Okay. And the Monell claim was dismissed at the motion to dismiss stage because plaintiff failed to sufficiently allege any of the components of a Monell claim. And with regard to, briefly, the unreasonable detention claim for the overnight stay under Gerstein, a person is entitled to a prompt probable cause hearing. And an arrestee has to prove that anything less than 48 hours was due to unreasonable delay. Here, the plaintiff was detained for less than 24 hours. And as Judge Gutter pointed out, the timeline of events establishes that, actually demonstrates, that the plaintiff cannot prove that there was an unreasonable delay. The investigation was begun on Tuesday, investigated through Wednesday, and at the start of the afternoon shift on Thursday, the plaintiff was arrested, then taken to the next available bond hearing. And the general orders and court rules required, because of the domestic nature of the cases, the charges, that she be detained for bond to be set by a judge and could not bond out at the police station. As to any of the remaining issues, I would refer Your Honors to our briefs. And if there are no further questions, I would request that the district court affirm, or this court affirm the district court's decisions. And I thank you for your time, and everyone stay healthy. Thank you very much. We will turn to Ms. Hemingson. Good morning, everybody. May it please the court, my name is Amy Hemingson, and I represent Rick Gimble in this matter. I would first like to just touch on a couple of things that Ms. Anderson had spoken about in her argument. She talks about the text messages being deleted, and I think it's important to note that the text messages disappeared while the child's telephone was in Ms. Anderson's possession, and no one else's. She had possession of the telephone. In regards to the telephone messages, she continues to indicate that her expert will say that they have been tampered with. The expert does not say they were tampered with. The expert says that the names of the files were changed, and that the format was changed. That's all. There's been no indication that any of the content of any of the recordings was changed. Ms. Anderson has listened to all of the recordings. She doesn't say that that's not her voice. All of the recipients of the calls, or the majority of the recipients of the calls were deposed. They listened to the tapes, and again, they recognized her voice, and there has been no indication that there's been any changes in any of the tapes, such as splicing or dubbing or any of that nature. She says that her expert has opinions that should make the granting of summary judgment improper. Well, if all it took was an expert to make summary judgment improper, every person who was attempting to fight off a motion for summary judgment would have an expert, because it would then be a free pass to trial. And again, her expert doesn't say that. In her briefs in the appeal, there are many footnotes as well, and a lot of the footnotes have nothing to do with this particular case. Again, she's trying to pile on relative to the family court case, which again has nothing to do with this case. She's even discussing matters that have happened after the granting of summary judgment in the family court matter. And again, I would just ask that those items not be taken into consideration. Ms. Hemmingsen, it's Judge Scudder. Let me ask you a quick question. This is kind of trying to get at a limiting principle. We were talking about limiting principles in our prior argument, and I have a question for you here that's the same. You make some very broad statements in your brief about Illinois law and emotional distress. Is it your view that under no circumstance, making of an intentionally false report to the police can give rise to a viable claim for the intentional infliction of emotional distress? Well, the Porter case, which is unlike our case in Porter, the Jiang versus Porter. Jiang is a Catholic priest. The Porter family had made a report to the police about a child abuse from this particular priest. Once it came down to it, they found that the family had multiple instances of suits against this particular church. This child had been coached by the parents and had said this on another occasion relative to someone else about sexual abuse. In that case, it was found that, yes, you could have that's lying and you could have intentional infliction of emotional distress in that respect. There was also the matter of... So we don't have to reach a holding that's anywhere near that broad to agree with you, right? That under no circumstance can somebody state a claim for emotional distress, intentional infliction with a false report to the police department. We can just more narrowly conclude here, as the district court did, that what happened is not so beyond the pale as to create a trial issue on that claim. Correct. What about allegations of mental instability? That's pretty shattering for someone to hear. Well, again, the instances that she can point to in the record where that was stated would not be anything but mere insults. And again, that would not be, you know, outside the... Would not rise to the level of intentional infliction of emotional distress. And that's something you think we could adjudicate as a matter of law as opposed to requiring further exploration? Well, at the summary judgment stage, we had all of the deposition transcripts, et cetera, that where people had testified relative to what had happened and what had taken place. And we had, the court had all of the evidence and found that it did not rise to the level of intentional infliction of emotional distress. Mr. Gimbel merely went to the police seeking assistance for all of the threats that Ms. Anderson had made to him, his family, and to his employer. And that's what he did. He sought the police's help. That's it. So could I ask you in that connection, that's what happened in the moment. What Ms. Anderson was arguing during her initial presentation was that there was a very long history as well of acrimony between these two parties. That happens, regrettably. But that his actions were not actually just isolated, I'm going to the police for help this time, but in fact against a long backdrop of harassment. Well, again, those instances don't come into the record in this particular case. We don't know what those instances might be. And furthermore, this case happens or begins when she begins to make the telephone calls in August of 2015. And the timeline ends when she's found not guilty in July of 2017. Hold on. I may be mistaken, but I thought the summary judgment record, as Ms. Anderson I think argues in her brief, did contain facts that in no way paint your client in a flattering light. I thought that was in the summary judgment record. And I think her point, she can correct me if I'm mistaken, is that this was an intentional and vindictive effort to have her arrested. You may not agree with that, but that's her point. I thought she was pretty clear about it. Well, she's been very clear that she does not like Mr. Gimbel and that she feels that he was vindictive against her. And trying to get her arrested on that particular day, especially. And that it's, I mean, you can paint it as a campaign of telephone harassment, but it's a two-way street, I think, is her point. That he, you know, he too left her, you know, inappropriate, threatening messages, harassing messages, and what have you. There's nothing in the record other than what she states, that he left her anything of that nature. And that's all from her opinion. There's nothing in the record to show that he left her threatening. Or she's a party. I mean, her statements can serve as evidence, first-hand experience, can't they? Sure. But again, there's nothing in, nothing within this time frame that shows that Dr. Gimbel did anything to her that would make this the proper outcome, the telephone calls. Okay, your time is up, Ms. Hemingson. Thank you very much. All right, thank you. Anything further, Ms. Anderson? Yes, please. In terms of the intentional infliction claim, I absolutely, this complaint is not limited just to the arrest. His harassment, as is in the record in my affidavit, which was basically disregarded by the trial court, talks about a huge history of harassment by this man. I mean, I had to block this man. I had to go get protective orders against this man. And all of, he just kept coming and coming, and that's very clear that I was the victim of harassment for years. And that this arrest was simply the icing on the cake for him. And then he continued to harass me in those proceedings. He tried to revoke the bond probably three or four times. He filed a very expensive custody case using the allegations of the case, of the criminal case, to seek greater custody rights. I've been in constant litigation for years because of his fake victimization, his fake police report, and his campaign of probably about eight years of harassment. This is not simply the case. Could I ask you, though, if that's the case, why isn't the right tribunal to address constant motions of the type that you're talking about, the state court supervising all of this? I mean, why would it spill over into this court? Because I had filed the motion for protective order before this happened. Then I got arrested, and everything got put on hold. So then I had to wait and sit through this. And so then all this went into the criminal case, and the bond got issued, and basically things got resolved by the no-contact orders, et cetera. But what he was doing was he was getting the no-contact order in one courtroom and trying to get me violations on the bond because this was part of his game. And then the other courtroom, the custody courtroom, he would say, well, why isn't my ex-wife communicating with me? He was playing a game in two courtrooms. And so this intentional infliction was really just a big game between him and his divorce attorney. In terms of the constitutional issues, if I could just go backwards a quick second, there's no question. I pled upon information and belief that Rick, my ex-husband, and the police officer influenced the state's attorney. There's no question about it, though. I mean, there's e-mails. I've got videos of the police officer making mental health remarks. I've got e-mails and all the pleadings and transcripts of my ex-husband making those comments. This young state's attorney knew nothing about me. And the question is, for purposes of this case, is who was the moving force? And there's a question of fact as to who was the moving force as to the bond issue. And there's a question of fact as to who the grand jury and how the grand jury was influenced. These were very young attorneys. My ex-husband and this police officer clearly came in and influenced them. And that had huge consequences. So I'd ask you, Your Honors, to consider that these young state's attorneys were not an intervening part because they were so inexperienced. And they listened to these people. I stood there with my arms crossed because I couldn't believe how ridiculous this was. I was being accused of a mens rea crime, and now I'm being called mentally ill. It was this big farce for a year. For the entire two years I was there. I'm running out of time. But I just wanted to mention in terms of the mail count that I one thing I want to say is, too, the text messages. First of all, they were absolutely deleted. I did not delete the text messages. And there's evidence of my ex-husband deleting the text messages in the custody evaluator's report. Basically, he told my son. So text messages can be deleted remotely sometimes. Isn't that right? Well, they were subject to a preservation order, and they were deleted remotely. Or I have evidence that suggests that he told my son to delete them. So the bottom line is my ex-husband was tampering with all the evidence in an effort to kill all the exculpatory evidence and make it look like he was this victim. It was a complete scheme. I've run out of time in terms of the balance of my arguments. I would ask Your Honor just to consider the briefs on that point, and I do appreciate your time. All right. Thank you very much. Thank you to all three counsel. This court will take the case under advisement.